## Isaac Waldron *versus* Samuel Tuttle.

A title to an undivided portion of land, cannot be acquired by possession against the real owner, while such owner remains in possession of the land.

Possession, in order to constitute a bar against the legal title, must, from its nature, be exclusive.

A deed thirty years old, is an ancient deed, and may be read in evidence without proof of its execution, provided possession of the land has constantly attended it.

Hearsay evidence is admissible to prove a pedigree—but this exception to a general rule is confined to what deceased relations, who had no interest to misrepresent, have been heard to say.

This was an action of trespass, for stopping the plaintiff's team, and taking from his sled and carrying away, one cord of wood.

The defendant pleaded in bar, that he was lawfully possessed of a certain close, being lot No. 107, in Barrington ; that the plaintiff unlawfully entered upon the same with his oxen and sled, and, unlawfully loaded, on said sled, said cord of wood, which was the property of the defendant, and attempted to carry it away, to prevent which the defendant took it from the sled.

The plaintiff, in his replication, traversed the allegation in the plea that the wood was the property of the defendant, upon which issue was joined.

The cause was tried here at February term, 1827, when, to show the wood to be his property, the defendant proved, that the plaintiff entered upon said lot No. 107, and cut down certain trees there growing and loaded the same upon said sled. And to prove that he was the owner of that lot, he gave in evidence a deed, dated in 1725, and purporting to be made by Thomas Beck, of Portsmouth, and to convey to his son, Joshua Beck, of Portsmouth, the original right or share of the said Thomas, in Barrington, as granted to him by the charter of that township, as an inhabitant of Portsmouth.

The defendant then gave in evidence to the jury, the testimony of Mrs. Cutts, who stated that she was a grand-daughter, of Joshua Beck, of Newburyport, and that she had repeatedly heard that the said Joshua, her grandfather, was a native of Portsmouth, and that she had no doubt that he was; and that he had eight children, to wit ;—Abigail, Mary, Jonathan, Sarah, Thomas, Hannah, Nathaniel and Anna.

The defendant also gave in evidence, a deed, dated in 1769, and made by Jonathan Beck and Nathaniel Beck, stating themselves to be children of Joshua Beck, and grandchildren of Thomas Beck, and conveying one third of a full share of land in Barrington, laid out to their grandfather, Thomas Beck, to S. Cross; and a deed dated in 1771, from S. Cross, and the rest of the children of Joshua Beck, conveying said lot No. 107, to Thomas Tuttle.

The defendant also gave in evidence, a chain of conveyances commencing in 1772, by which said lot of land was conveyed from said Tuttle to himself, which conveyances were,

1st, A deed from Thomas Tuttle, of Dover, to Thomas Tuttle, of Barrington, dated December 16, 1772, conveying a tract or lot of land in Barrington, where the grantee then lived, being lot No. 108, also, forty acres of land in said Barrington, adjoining on the easterly side of the aforesaid premises, it being a part of a ninety acre lot No. 107,

in the third range of lots originally laid out to Thomas Beck of Portsmouth.

Waldron
v.
Tuttle.

2d, A deed from Thomas Tuttle, of Dover, to Ebenezer Tuttle, dated April 21, 1772, conveying to said Ebenezer Tuttle, part of said ninety acre lot, adjoining Ebenezer Tibbetts, the whole length of said lot, and containing fifty acres.

3d, A deed of Thomas Tuttle of Barrington, to the defendant, of the said forty acres conveyed to him by his father Thomas Tuttle of Dover, dated March 10, 1803.

4th, Two deeds from Tobias Tuttle and Thomas Tuttle, the devisees of Ebenezer Tuttle, conveying to the defendant all their right to lot No. 107, in Barrington. The defendant also proved, that those under whom he claimed entered and cut wood and timber on said lot several years before 1788, and that they and the defendant continued to cut wood there while the lot remained uncultivated. And in 1803, the defendant fenced two thirds of the lot and occupied it as a field and pasture. And in 1807, those, whose title the defendant now has, fenced the remainder of the lot.

The plaintiff objected to that part of the testimony of Mrs. Cutts, in which she stated that she had often heard that her grandfather was a native of Portsmouth, and also to the giving in evidence of the said deeds made in 1769, 1771, and 1772, without proof of the execution of the same, but the court admitted said testimony of Mrs. Cutts and said deeds.

The plaintiff then offered to read in evidence, a deed executed by one J. Felker, dated in 1784, in which Felker described himself as collector of taxes for the town of Barrington for the year 1783, and conveyed to the plaintiff for non payment of taxes upon said lot, fourteen acres, being part of said lot, and lying in common with the rest of said lot. But the plaintiff offered no evidence to prove that J. Felker was collector of taxes, nor of any proceedings whatever, to shew that said land was liable to be sold for non payment of taxes.

He stated, however, that he had evidence to show that he had at various times, from 1789, to the time of bringing this suit, entered upon different parts of said lot and taken firewood therefrom.

The defendant objected to the admission of this deed in evidence, and the court rejected the same.

The jury having returned a verdict in favor of the defendant, the plaintiff moved for a new trial upon the foregoing case.

*Woodbury,* for the plaintiff, contended, that Felker's deed ought to have been admitted, if for no other purpose, to show the nature and extent of the plaintiff's possession.

He also urged, that the deeds of 1769, 1771 and 1772, were improperly admitted in evidence without proof of their execution, contending that a deed thirty years old cannot be admitted without proof of its execution, unless possession by the grantee, named in the deed, has gone along with the deed.

He further contended, that the testimony of Mrs. Cutts, that Joshua Beck was reputed to be a native of Portsmouth was inadmissible. If it were intended to be used as evidence of pedigree, it was incompetent testimony, because, on questions of pedigree, it is the declarations of deceased relations alone, which are evidence. 13 Vesey, 147 and 514 ; 3 D. & E. 723 ; 1 M. & S. 689 ; 14 East, 330.

If it were intended to prove that Thomas Beck was an inhabitant of Portsmouth, that was a naked question of residence, which could not be proved by hearsay evidence. 8 East, 539, *The King* v. *The inhabitants of Erith ;* Phillip's Ev. 180.

*Mason,* for the defendant.

Mrs. Cutts' testimony was admissible. The question was, whether certain persons, under whom the defendant claimed, were the children or descendants of Joshua Beck, of Portsmouth, to whom Thomas Beck had convey-

ed the land, and the testimony of Mrs. Cutts was intro- duced to prove the pedigree of those persons. And general reputation is evidence of pedigree. 8 Johns. 118, *Jackson* v. *Cooley* ; Peake's Ev. 9 ; Cowper 591.

RICHARDSON, C. J. It is contended in behalf of the plaintiff, in this case, that he is entitled to a new trial, because the deed of Felker was improperly rejected as evidence, and we shall examine this ground for a new trial in the first place.

We have already decided, in this case, that it is not competent for a jury to presume, from the mere production of a collector's deed, and from proof of possession under it, that the sale of the collector was legal. 3 N. H. Rep. 340. We have, therefore, no hesitation in holding, that under the circumstances of this case, the deed of Felker was not legal evidence of a conveyance of the land. There was no proof that he was a collector, and had authority to convey under any circumstances—no proof that the provisions of the statutes, which authorized a sale of lands for taxes, had been pursued. His deed must, therefore, be considered as wholly inoperative, as an instrument of conveyance.

But there are cases in which a deed, thus inoperative as an instrument of conveyance, may be evidence as to the extent and character of possession. Thus it being a presumption of law, that he who enters under a deed, enters claiming according to his deed, and that his possession is adverse to all other titles, when a party relies upon adverse possession against the legal title, a deed by which nothing passed, may be evidence of the extent and character of his possession. 3 N. H. Rep. 49, *Lund* v. *Parker* ; ibid, 23, *Riley* v. *Jameson.*

We are not however aware, that there is any case, in which a title to an undivided portion of land can be acquired by possession against the real owner, while he remains in the occupation of the land. For, if he who enters into land must be presumed to enter claiming according

*Waldron*
*v.*
*Tuttle.*

to his title, surely, the real owner, while in possession, must be presumed to be there claiming according to his title, so that no lapse of time can, under such circumstances, form a bar to the legal title.

In this case, the defendant and those under whom he claims, have been in the actual possession of the land, from a period long antecedent to the time when the plaintiff first made a claim, down to this day. And although the plaintiff may have occasionally entered and taken wood from the land, since the year 1789, neither the extent of his claim, nor the character of his possession, can be at all material in this case. For whatever may have been the extent of his claim, or the nature of his possession it cannot avail him against the legal owner, who has been in the possession of the land during the whole time. Possession, which constitutes a bar to the legal title, must, from the very nature of the thing, be exclusive.

A case may, perhaps be imagined, where a conveyance of an undivided portion of a lot of land by him in whom the legal title has been shown to have been, to one who has jointly occupied the land with him, sharing the expense, and dividing the produce, for a great length of time, might be presumed from such joint occupation. And if these parties, and those under whom they claim, had so improved this lot as tenants in common from 1789, down to this time, laboring jointly upon the land and managing it at their joint expense, perhaps such a joint occupation for so long a time, might now be left to a jury as evidence of the regularity of the collector's proceedings. But it has not been pretended, that there was ever any such joint occupation by these parties, and we are of opinion that the deed was properly rejected.

Another ground, on which the plaintiff claims a new trial, is, that the deeds of 1769, 1771, and 1772, were admitted as evidence for the defendant without proper proof of their having been duly executed.

The rule is, that a deed thirty years old may be read in evidence, as an ancient deed, without proof of its execution, provided possession has constantly attended it. 3 Johns. 292, *Jackson* v. *Blanshan*. It is the accompanying possession which raises the presumption of authenticity in favor of an ancient deed. It is not, however, necessary, for this purpose, that the possession should be in the grantee named in the deed during the whole time. Possession is said to accompany a deed, when it remains in those who claim under the deed ; and possession was shown to have attended these deeds nearly half a century, and we entertain no doubt, that they were properly received as evidence without proof of their execution.

But it is further contended, on the part of the plaintiff, that the testimony of Mrs. Cutts, that she had often heard that her grandfather was a native of Portsmouth, was improperly submitted to the jury. In order to understand the nature of this objection to the verdict, it is necessary to ascertain the point, which the testimony was intended to establish.

The defendant endeavored to deduce his title from Thomas Beck, of Portsmouth. He had the copy of a deed from the said Thomas Beck to his son Joshua Beck ; and he had a regular chain of conveyances from the heirs of Joshua Beck, of Newburyport. To connect his title with Thomas Beck, of Portsmouth, it was necessary to shew that Joshua Beck, of Newburyport, was the son of Thomas Beck of Portsmouth. The testimony of Mrs. Cutts did not go directly to prove this point ; but it seems to have been introduced to render it probable that Joshua Beck, of Newburyport, was the son of Thomas Beck, of Portsmouth, because it had been commonly reported that Joshua was a native of Portsmouth. The evidence may then be considered as introduced to prove a pedigree, and must be tested by the rules which apply to that kind of testimony.

VOL. I.            48

Waldron
*v.*
Tuttle.

That hearsay evidence is admissible to prove a pedigree, has long been a well established exception to the general rule of law, which excludes that species of evidence. But it is an exception which has often been loosely and carelessly stated, in terms much too general, and has sometimes been incorrectly applied.

An attentive examination of the adjudged cases, will show this exception to the general rule to be this; the declarations of the deceased relations, who had at the time no interest to misrepresent, are evidence to prove a pedigree.

The exception is confined to the declarations of persons deceased, because, if living, they ought to be called as witnesses. Philips Ev. 176 ; 2 Strange, 924, *Pendrell* v. *Pendrell*

It is confined to the declarations of relations, because they are likely to be acquainted with the pedigree of each other, and if it were not so limited, it would be necessary on every occasion, before the testimony could be admitted, to enter upon an enquiry as to the degree of intimacy which subsisted between the person who made the declarations, and the person to whom they related, which would render the exception uncertain and difficult to apply. 2 Bing. 86, *Johnson* v. *Lawson* ; 18 Johns. 37, *Jackson* v. *Browner*.

It is confined to the declarations of relations who had no interest to misrepresent, because it is reasonable, that only such declarations, should be admitted as have in their favor a presumption of being consistent with the truth ; which presumption cannot belong to declarations which are made under a bias and feeling of interest. Philips Ev. 178.

Such being the limitations of this exception to the general rule, it is clear, that the evidence of Mrs. Cutts does not come within the exception. It neither appears that

the persons, from whom she heard what she states, are
dead nor that they were relations.   And as this evidence
was improperly submitted to the jury, there must be

*A new trial granted.*